UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROBERT H. SUNDERMEIR,  :
    *Plaintiff*,  :    No. 3:16cv18 (MPS)
      :
  v.  :
      :
CHAPDELAINE, *et al.*  :
    *Defendants.*  :

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Robert H. Sundermier ("Mr. Sundermier") brings claims against Dr. Syed Naqvi ("Dr. Naqvi") and Dr. Johnny Wu ("Dr. Wu") (collectively, the "Defendants")[1], alleging a violation of 42 U.S.C. § 1983 based on deliberate indifference to his serious medical needs in violation of the Eighth Amendment. ECF No. 26. The Defendants filed a motion for summary judgment. ECF No. 80. For the reasons set forth below, the motion is GRANTED.

**I.    Facts[2]**

Mr. Sundermier has been incarcerated at the MacDougall Walker Correctional Institution since May 15, 2015. ECF No. 80-2 ¶ 1; ECF No. 91-1 ¶ 1. He injured his ankle and was

---

[1] Mr. Sundermier initially filed suit *pro se* against Warden Carol Chapdelaine, Dr. Syed Naqvi, Dr. Johnny Wu, Nursing Supervisor Heidi Greene, and Associate Director of Patient Care Mary Ellen Castro. ECF No. 1. The Court issued an initial review order, dismissing the claims against all Defendants in their official capacities, and against Defendants Chapdelaine, Wu, Greene, and Castro in their individual capacities. ECF No. 14. Mr. Sundermier then filed an amended complaint against Defendants Naqvi, Wu, and Greene. ECF No. 26. His Eighth Amendment claim for deliberate indifference to medical needs was permitted to proceed against Defendants Naqvi, Wu, and Greene in their individual capacities, ECF No. 28, and I appointed counsel to represent him pro bono, ECF No. 57. After the Defendants filed the motion for summary judgment, ECF No. 80, the parties filed a stipulation of voluntary dismissal regarding Defendant Greene, ECF No. 95. All claims asserted against Defendant Greene were dismissed with prejudice. ECF No. 96.

[2] The facts are taken from the parties' Local Rule 56 Statements and the underlying record. Unless otherwise indicated, all facts are undisputed.

1

examined by Dr. Naqvi on August 31, 2015. ECF No. 80-2 ¶¶ 2-3; ECF No. 91-1 ¶¶ 2-3. After examining him, Dr. Naqvi prescribed pain medication and ordered x-rays of the ankle. ECF No. 80-2 ¶ 4; ECF No. 91-1 ¶ 4. A few days later, on September 4, 2015, Mr. Sundermier was taken to the University of Connecticut ("UConn") Emergency Department where Dr. John Yaylagul diagnosed him with an ankle sprain. ECF No. 80-2 ¶¶ 6-7; ECF No. 91-1 ¶¶ 6-7; Ex. 2 at 6. Back at MacDougall Walker, Dr. Naqvi examined Mr. Sundermier on September 9, 2015 and again on September 21, 2015. ECF No. 80-2 ¶¶ 8, 13; ECF No. 91-1 ¶¶ 8, 13. At the second appointment, Dr. Naqvi noted that Mr. Sundermier continued to experience pain in his left ankle and had a cold and discolored left foot. Ex. 2 at 18. The following day, Dr. Naqvi submitted a request to the Utilization Review Committee ("URC") for Mr. Sundermier to see a vascular surgeon. ECF No. 80-2 ¶ 15; ECF No. 91-1 ¶ 15.

The request was approved, and Mr. Sundermier was seen by Dr. James Menzoian, a vascular surgeon at UConn Health Center, on November 4, 2015. ECF No. 80-2 ¶¶ 16-17; ECF No. 91-1 ¶¶ 16-17. Dr. Menzoian took x-rays of the abdominal aorta and lower extremities as well as a CT (CAT scan) of the lumbar spine. Ex. 2 at 19. After two days, Dr. Menzoian determined that Mr. Sundermier was stable and discharged him with "no restrictions in his activities." Ex. 2 at 19. Dr. Naqvi was surprised by Dr. Menzoian's report because he believed that Mr. Sundermier's symptoms –including that his leg was cold and blue – indicated a vascular issue rather than an orthopedic issue. Ex. 4 at 41-42 ("So although I made orthopedic appointment at some point, but that's why I sent him to vascular before because in orthopedic issue, first of all, there was no bone broken. X-ray assured that. And if there was, he wouldn't be standing up."). On November 10, 2015, Dr. Naqvi submitted a request for a second vascular specialist. Ex. 3 at 2. He also examined Mr. Sundermier himself on November 15, 2015. ECF

No. 80-2 ¶ 23; ECF No. 91-1 ¶ 23. The URC request was approved and Dr. Cloud, a vascular surgeon at UConn, examined Mr. Sundermier on December 2, 2015. ECF No. 80-2 ¶ 26; ECF No. 91-1 ¶ 26. Dr. Cloud noted that "[t]here is no vascular abnormality that would cause his symptoms" and recommended an "evaluat[ion] by orthopedic surgery ASAP." Ex. 2 at 22; ECF No. 80-2 ¶ 27; ECF No. 91-1 ¶ 27.

The following day, December 3, 2015, Dr. Naqvi prescribed a wheelchair and pain medication for Mr. Sundermier. ECF No. 80-2 ¶ 28; ECF No. 91-1 ¶ 28; Ex. 2 at 23. Dr. Naqvi examined him again on December 10, 2015. ECF No. 80-2 ¶ 29; ECF No. 91-1 ¶ 29; Ex. 2 at 24. He noted that Mr. Sundermier was still experiencing pain, prescribed pain medication, and wrote "needs to see ortho" in his notes. Ex. 2 at 24. In early 2016, Dr. Naqvi and Physician Assistant Kevin McCrystal began to split patients alphabetically. ECF No. 80-2 ¶ 37; ECF No. 91-1 ¶ 37. Mr. Sundermier became PA McCrystal's patient, but Dr. Naqvi also continued to see and treat him. ECF No. 80-2 ¶¶ 38-39; ECF No. 91-1 ¶¶ 38-39. PA McCrystal has not been named as a defendant in this action.

Dr. Alaec, an orthopedic specialist at UConn, examined Mr. Sundermier on March 18, 2016. Ex. 2 at 26; ECF No. 80-2 ¶ 34; ECF No. 91-1 ¶ 34. Dr. Alaec noted that Mr. Sundermier "continues to have [a] painful dusky swollen left foot," and that "vascular surgery ruled out any arterial or venous problem," but that Mr. Sundermier "cannot bear weight and [his] ankle movements are limited and tender though x rays are fine." Ex. 2 at 26. He also noted that, "as it is not getting better[,] non urgent ortho opinion will be appropriate." *Id*. Finally, he recommended "PT [physical therapy] for ankle [range of motion] & strengthening – self performed," a "rheumatology consult," and "foot & ankle MRI." *Id*. On March 22, 2016, PA

McCrystal submitted a request for an MRI to the URC. Ex. 3 at 3. The request was approved on April 2, 2016. *Id*.[3]

On July 11, 2016, Mr. Sundermier was evaluated by Dr. Emmanuel, a vascular surgeon at UConn, who made the following recommendations: "patient to be seen by orthopedics," "does not need follow up with vascular surgery," and "no vascular surgery intervention." Ex. 2 at 28; ECF No. 80-2 ¶¶ 42-43; ECF No. 91-1 ¶¶ 42-43. Mr. Sundermier was sent to another vascular specialist on September 12, 2016, who recommended a "foot/ankle specialist." Ex. 2 at 29; ECF No. 80-2 ¶ 44; ECF No. 91-1 ¶ 44.

PA McCrystal and Dr. Naqvi then examined Mr. Sundermier on October 19, 2016 and October 20, 2016, respectively, as there was still no diagnosis. Ex. 2 at 30; ECF No. 80-2 ¶ 46; ECF No. 91-1 ¶ 46. Dr. Naqvi thought Mr. Sundermier's hormone treatment—which he received because he is transgender—might be related to his foot problems. ECF No. 80-2 ¶¶ 47-48; ECF No. 91-1 ¶¶ 47-48. Dr. Naqvi discussed this with Dr. Wu and they agreed to stop the hormone treatment through the URC process. ECF No. 80-2 ¶¶ 49-51; ECF No. 91-1 ¶¶ 49-51. Dr. Wu was the medical director, but generally became more involved with a patient's care as diagnostic possibilities became more complex and uncommon. ECF No. 80-2 ¶¶ 60, 63; ECF No. 91-1 ¶¶ 60, 63.

Dr. Mozcka, an orthopedic specialist at UConn, examined Mr. Sundermier on November 25, 2016. ECF No. 80-2 ¶ 52; ECF No. 91-1 ¶ 52. Dr. Mozcka wrote "no ortho intervention" and that the condition was "possibly CRPS." Ex. 2 at 31. He recommended "neurology consult [illegible] CRPS." *Id*. CRPS stands for complex regional pain syndrome and is sometimes also

---

[3] Another doctor, Dr. Emmanuel, later notes that an "MRI could not be performed as [Mr. Sundermier] has a metal clip in his brain." Ex. 2 at 28.

4

referred to as RSDS (reflex sympathetic dystrophy syndrome).[4] On December 15, 2016, PA McCrystal submitted the following request to the URC:

> 53yo | ankle injury 8/31/15. Continues with cold, dusky, painful foot ? CRPS. Unable to bear weight. Has had multiple visits to ortho and vascular surgery. Has had xrays, CTA's, EMG, consultation with foot/ankle specialists, neurology, Narcotic pain medication. There has been mention of sympathetic nerve block as well as amputation. It seems there is no clear plan of care. I/M is amenable to amputation. If possible, request interdisciplinary case review. Consultation with vascular surgery and pre-op evaluation for amputation if amenable.

Ex. 2 at 32. This request was approved on December 21, 2016. *Id*.

Dr. Kristine Orion, a vascular surgeon at Yale New Haven Health, examined Mr. Sundermier on February 14, 2017. Ex. 2 at 33-36; ECF No. 80-2 ¶¶ 68, 71; ECF No. 91-1 ¶¶ 68, 71. She noted that Mr. Sundermier had seen multiple specialists and "received a diagnosis of RSDS." Ex. 2 at 33. She wrote that "he likely has RSDS" and that she would order a CT, and would try to obtain information about whether it was safe for him to undergo an MRI. Ex. 2 at 36. She indicated that he should return to the hospital in four weeks or after the CT was completed. *Id*.

On April 19, 2017, Dr. Lori-Ann Oliver, an anesthesiologist at Yale New Haven Health, evaluated Mr. Sundermier. Ex. 2 at 38. She noted that he "ha[d] chronic dystropic changes to his left foot and ankle consistent with CRPS type 1." *Id*. She further wrote that "CRPS type 1 has the best prognosis if there is intervention within the first 3 months after developing [the changes experienced by Mr. Sundermier] and the most effective treatment modality to date is PT [physical therapy] and OT [occupational therapy]." *Id*. Dr. Orion also detailed the steps she took to address Mr. Sundermier's pain before resorting to surgery: she explained that she had

---

[4] I refer to this condition as CRPS except when quoting medical personnel who refer to it as RSDS.

performed multiple angiograms and admitted him for "regional sympathetic block and physical therapy," but that "all of [these approaches] failed to relieve his pain." Ex. V at 2. She also noted that he had "a significant amount of wasting as well as complete numbness and weakness on the left foot and ankle." *Id*. Finally, she wrote that he was "aware of the risks of the surgery including incomplete resolution or even worsening of his pain," but nonetheless requested the amputation. *Id*.

Dr. Orion amputated Mr. Sundermier's left leg below the knee at Yale New Haven Health on April 28, 2017. Ex. V. Mr. Sundermier then had a revision surgery on December 21, 2017 to help his prosthetic fit better. Ex. W at 1.

## II. Legal Standards

### A. Motion for Summary Judgment

A court may grant a motion for summary judgment only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks omitted). In determining whether there is a genuine dispute of material fact, "the court must draw all reasonable factual inferences in favor of the party against whom summary judgment is sought." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).

"The moving party bears the initial burden of showing why it is entitled to summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006). It may satisfy this burden by "point[ing] to evidence that negates its opponent's claims" or "identify[ing] those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact, a tactic that

requires identifying evidentiary insufficiency and not simply denying the opponent's pleadings." *Id*. at 272-73. "Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial." *Jusino v. Frayne*, 2018 WL 279982, at *3 (D. Conn. Jan. 3, 2018). "He must present such evidence as would allow a jury to find in his favor to defeat the motion for summary judgment." *Id*. "Like the movant, the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 273.

### B. Deliberate Indifference to Medical Needs

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment" and may be "manifested by prison doctors in their response to the prisoner's needs" or by prison officials "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks and citation omitted). To establish a claim for deliberate indifference to a serious medical need, Mr. Sundermier must satisfy two requirements.

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Salahuddin*, 467 F.3d at 279 (internal quotation marks omitted). "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment," as is the case here, "it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks omitted) (emphasis in original).

"The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id*. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[A]wareness may be proven from the very fact that the risk was obvious." *Spavone v. New York State Dept. of Correctional Services*, 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks omitted).

Thus, deliberate indifference "entails something more than mere negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). And "a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Smith*, 316 F.3d at 184 (internal quotation marks omitted). "A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (internal quotation marks omitted).

### III.    Discussion

Dr. Naqvi and Dr. Wu move for summary judgment on the grounds that Mr. Sundermier cannot demonstrate facts supporting the subjective prong of the deliberate indifference test with respect to either of them and that, in any event, they are both protected by qualified immunity. ECF No 80-1. I agree that the record includes no evidence from which a reasonable juror could find that Dr. Naqvi evinced the requisite mental state. I also find that there is no evidence to

support a finding of liability against his supervisor, Dr. Wu, under Section 1983. Accordingly, I do not reach the qualified immunity issue.

### A. Dr. Naqvi

Mr. Sundermier argues that Dr. Naqvi was deliberately indifferent to his medical needs because he (1) did not arrange for an orthopedic specialist until March 2016 despite suggestions by other doctors, in September and December 2015, that he make such a referral, ECF No. 91 at 19-22, and (2) prevented access to timely diagnosis and treatment even after the March 2016 appointment, *id*. at 22-30. However, Mr. Sundermier has not submitted any evidence to support a finding that Dr. Naqvi acted with a sufficiently culpable state of mind, as required to establish the subjective prong of an Eighth Amendment claim.

#### 1. August 31, 2015 to March 18, 2016

Mr. Sundermier argues that Dr. Naqvi's "failure to ensure that [he] was evaluated by both an orthopaedic and vascular specialist [in September 2015]" constitutes deliberate indifference. ECF No. 91 at 20. As discussed above, the subjective requirement for a finding of deliberate indifference requires that the official "act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin*, 467 F.3d at 280. The undisputed evidence in the record shows that Dr. Naqvi did not act with sufficient culpability as he was initially unaware of a substantial risk of harm and, when Mr. Sundermier's symptoms continued, he provided treatment and referrals to specialists of particular types and in a particular sequence that he deemed appropriate in the exercise of his medical judgment.

Initially, the injury did not appear to require the immediate assistance of a specialist of any kind. On the day of the injury, Dr. Naqvi examined Mr. Sundermier, provided him with pain medication, and ordered x-rays, which showed no fracture. ECF No. 80-2 ¶¶ 2-4; ECF No. 91-1

9

¶¶ 2-4; Ex. 4 at 22-23. A few days later, Dr. Yaylagul examined Mr. Sundermier at the emergency room and diagnosed him with an ankle sprain, writing that he should "elevate, use crutches," and do activities "as tolerated." Ex. 2 at 15. Thus, neither Dr. Naqvi's own examination, nor that of Dr. Yaylagul, indicated a substantial risk of harm at this time, assuming that Mr. Sundermier followed the prescribed treatment. Although Mr. Sundermier argues that it "should have been clear that [he] was not suffering from a common ankle sprain," ECF No. 91 at 20, he does not provide any evidence suggesting that Dr. Naqvi was aware of such a risk or that such a risk was obvious at the time.

In addition, when Mr. Sundermier's symptoms continued, Dr. Naqvi provided treatment and referrals to the specialists he deemed appropriate. He examined Mr. Sundermier twice in September after the emergency room visit: first on September 9, 2015 and then again on September 21, 2015. ECF No. 80-2 ¶¶ 8, 13; ECF No. 91-1 ¶¶ 8, 13. And on September 22, Dr. Naqvi submitted a request to the URC so Mr. Sundermier could see a vascular surgeon. ECF No. 80-2 ¶ 15; ECF No. 91-1 ¶ 15. When the first vascular surgeon determined that Mr. Sundermier was stable and discharged him, Ex. 2 at 19, Dr. Naqvi submitted a request for a second vascular consultation, Ex. 3 at 2. He also examined Mr. Sundermier himself on November 15, 2015, in between the two vascular appointments. ECF No. 80-2 ¶ 23; ECF No. 91-1 ¶ 23. Because Mr. Sundermier does not point to any evidence creating a genuine dispute as to those facts, namely that Dr. Naqvi examined him several times and referred him to two vascular specialists in the first few months after his injury in order to ascertain a diagnosis, he is unable to show that Dr. Naqvi was deliberately indifferent during that time.

Nor was it deliberately indifferent for Dr. Naqvi not to arrange for Mr. Sundermier to see an orthopedic specialist before March 2016. As discussed above, for an official to be deliberately

indifferent, he "must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. That is to say, he "must be subjectively aware that his conduct creates . . . a risk." *Id.* at 281. Here, Dr. Naqvi stated that he did not believe an orthopedic specialist was urgently required because "[n]othing was broken" and "[t]here was nothing acute," thereby suggesting it "was more of a vascular thing than orthopedic." Ex. 4 at 51. This is supported by evidence in the record, namely, Dr. Naqvi's repeated referrals to vascular specialists at this time. *See* Ex. 3 at 1-2. Even if Dr. Naqvi was negligent in deciding to send Mr. Sundermier to a vascular specialist rather than an orthopedic specialist in the first few months after his injury, that would be insufficient to create a genuine dispute of fact about whether Dr. Naqvi was deliberately indifferent. *Salahuddin*, 467 F.3d at 280 ("Deliberate indifference is a mental state equivalent to subjective recklessness . . . But recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.").

The notes from Dr. Yaylagul in September 2015 and Dr. Cloud in December 2015 recommending orthopedic evaluation, Ex. 2 at 15 & 22, do not change this analysis as "[t]he law is clear that a difference of opinion[,] even among medical professionals themselves, as to the appropriate course of medical treatment does not in and of itself amount to deliberate indifference." *Parks v. Blanchette*, 144 F. Supp. 3d 282, 322 (D. Conn. 2015) (internal quotation marks, citations, and alterations omitted). Neither Dr. Yaylagul nor Dr. Cloud is an orthopedic doctor, and there is nothing in the record to suggest that either of them had any more orthopedic expertise than Dr. Naqvi. Moreover, Dr. Yaylagul's suggestion came at a time when the injury appeared to be minor, and was accompanied by conservative treatment instructions that directed Mr. Sundermier to elevate his foot and use crutches—not signs that an orthopedic referral was urgent. Ex. 2 at 15.

In any case, despite the suggested referrals from Dr. Yaylagul and Dr. Cloud, there is no evidence in the record to support Mr. Sundermier's argument that earlier referrals to an orthopedic specialist would have alleviated his pain or expedited the CRPS diagnosis. ECF No. 91 at 20. As discussed below, CRPS is an uncommon neurological condition, and the record shows that neither the first four vascular specialists nor the first orthopedic specialist made any notation suggesting a CRPS diagnosis as a possibility. Ex. 2 at 19, 22, 26, 28, 29. In addition, Mr. Sundermier continued to experience pain and to have a "cold, dusky . . . foot," Ex. 2 at 32, even after his March 18, 2016 appointment with Dr. Alaec, the first orthopedic specialist. Even the second orthopedic specialist, who first mentioned CRPS, noted only that Mr. Sundermier's condition, which by then had persisted for over a year despite treatment and specialist examinations, was "possibly CRPS," *id.* at 31, and Mr. Sundermier continued to experience pain after this second orthopedic consultation as well, *id.* at 32. Moreover, CRPS is a difficult diagnosis that takes months to properly diagnose even outside prison. Exhibit 6 at 32 (Dr. Oliver explaining that the time to make a diagnosis "depends on the patient" and "a lot of times it takes six months before people can realize they have anything like this or can rule it out"). It is therefore speculative to suggest that an earlier referral to an orthopedic specialist would have resulted in earlier relief for Mr. Sundermier or in an earlier CRPS diagnosis.

Finally, Dr. Naqvi referred Mr. Sundermier to a number of specialists to make a diagnosis; the timing of these referrals and the order in which they were completed are medical judgments entitled to judicial deference and cannot form the basis of a deliberate indifference claim. *Verley v. Goord*, 2004 WL 526740, at *12 (S.D.N.Y. Jan. 23, 2004) (noting that "an inmate's opinion" regarding diagnostic steps "is a classic example of the type of medical judgment that is ordinarily given judicial deference, and does not form the basis of a deliberate

indifference claim"). This is especially true in this case because, as discussed below, the medical condition at issue was particularly difficult to diagnose. In light of these circumstances, Mr. Sundermier has not pointed to any evidence to support his claim that Dr. Naqvi acted with a sufficiently culpable mental state when he did not arrange for Mr. Sundermier to see an orthopedic specialist before March 2016.

### 2. March 18, 2016 to December 21, 2017

Mr. Sundermier argues that Dr. Naqvi continued to delay his access to experts who could diagnose him and provide appropriate treatment even after the orthopedic evaluation on March 18, 2016. ECF No. 91 at 22-30. Specifically, he argues that the Court should deny summary judgment because the delay he experienced was "similar to that experienced by the plaintiff in *Hathaway*," a case in which "the Second Circuit concluded that whether the plaintiff's general practitioner was deliberately indifferent to the plaintiff's serious medical needs was for the jury to decide." ECF No. 91 at 28. However, the difficulty of establishing a diagnosis, and the prompt treatment Mr. Sundermier received once he had a proper diagnosis, set this case apart from *Hathaway*.

In *Hathaway*, the defendant never informed the plaintiff that he had two broken pins in his hip, waited two years after discovering the broken pins to ask that the plaintiff be re-evaluated for surgery, and only requested surgery at that time because the plaintiff learned of the pins from a nurse and indicated that he would consent to surgery. *Hathaway v. Coughlin*, 37 F.3d 63, 65-67 (2d Cir. 1994). The Second Circuit held that a "jury could infer deliberate indifference to Hathaway's serious medical needs from [defendant's] failure (1) to disclose the broken pins and to discuss the option of surgery with Hathaway despite his sudden resurgence of hip pain and (2) to refer Hathaway for re-evaluation for surgery [for more than two years] despite requests for

further treatment from Hathaway and student attorneys acting on his behalf." *Id*. at 68-69. Unlike in *Hathaway*, there was no failure to disclose critical medical information to Mr. Sundermier and much of the delay was caused by a factor outside Dr. Naqvi's control, i.e., the difficulty of diagnosing CRPS. *See Hathaway*, 37 F.3d at 67 ("Most telling is the fact that Foote never informed Hathaway that he had two broken pins in his hips."); *Hernandez*, 341 F.3d at 146 (distinguishing the plaintiff's claim from *Hathaway* because it was unclear what to do about the plaintiff's pain and most of the delay was caused by factors outside the defendants' control).[5]

CRPS is an uncommon neurological condition; it is not an orthopedic or vascular condition. *See* ECF No. 91-1 at ¶ 56 (Mr. Sundermier agrees that CRPS "is not a common condition"); Ex. 5 at 10 (Dr. Orion describing CRPS as "a problem with pain and the wiring of the nerves regarding pain); Ex. 6 at 10 (Dr. Oliver describing CRPS as "somato sensory, which is a term we use to describe how the brain affects the body and the nerves"). And, as Dr. Oliver explained, "[t]here is no rough guideline [where one would expect the CRPS diagnosis to be made] because it's a pretty rare disorder" and "you cannot make a diagnosis until you've ruled out everything else." Exhibit 6 at 12; *see also id.* at 32 ("[S]ince [CRPS] is a diagnosis of exclusion, a lot of times it takes six months before people can realize they have anything like this

---

[5] Mr. Sundermier states that "Dr. Naqvi did not advise [him] that Dr. Cloud had made an urgent referral for him to be evaluated by an orthopaedic specialist as soon as possible." ECF No. 91 at 30. As shown, however, there is no evidence in the record that the failure to make an urgent referral to an orthopedic specialist caused Mr. Sundermier any harm, i.e., there is no evidence that an earlier referral to Dr. Alaec, who saw Mr. Sundermier in March 2016, would have expedited the CRPS diagnosis or alleviated Mr. Sundermier's pain. Also as shown, Dr. Naqvi, in his medical judgment disagreed with the notion that an urgent referral to an orthopedic specialist was necessary and there is nothing in the record to suggest that he was wrong on that score. This is a far cry from *Hathaway*, where the doctor did not disclose the obvious cause of the plaintiff's injury or offer an obvious surgical solution. Dr. Naqvi did not know the cause of Mr. Sundermier's condition, nor did he withhold information about a known treatment for the condition.

or can rule it out."). Indeed, the emergency room doctor, the first orthopedic specialist, and the first four vascular specialists were unable to diagnose Mr. Sundermier properly. Ex. 2 at 15, 19, 22, 26, 28, 29. It was only Dr. Mozcka, the second orthopedic specialist, who wrote that it was "possibly CRPS" and recommended a "neurology consult." Ex. 2 at 31.

Once Dr. Mozcka raised the possibility of CRPS on November 25, 2016, Ex. 2 at 31, Mr. Sundermier quickly received further treatment. PA McCrystal submitted a request to the URC for interdisciplinary case review on December 15, 2016. Ex. 2 at 32. Dr. Orion evaluated him on February 14, 2017 at Yale New Haven Health and noted that he "has received a diagnosis of RSDS" and "likely has RSDS."[6] Ex. 2 at 33, 36. Dr. Oliver then confirmed that he "ha[d] chronic dystropic changes to his left foot and ankle consistent with CRPS type 1" on April 19, 2017. Ex. 2 at 38. After this confirmation, Mr. Sundermier received treatment to alleviate his pain: multiple angiograms as well as regional sympathetic block and physical therapy. Ex. V. When this treatment was unsuccessful, he received (at his request) an amputation on April 28, 2017, Ex. V at 1-2, and a revision surgery on December 21, 2017 to help his prosthetic fit better, Ex. W at 1.

The record therefore shows that Dr. Naqvi referred Mr. Sundermier to a specialist within weeks of the injury, Ex. 3 at 1, and that he was ultimately referred to <u>five</u> specialists before the possibility of CRPS was ever mentioned, Ex. 2 at 19, 22, 26, 28, 29. These referrals and the difficulty of diagnosis distinguish the delay in this case from that in *Hathaway* where a jury could have inferred deliberate indifference from the defendant's failure to disclose a <u>known</u> cause of the plaintiff's pain and the defendant's decision to delay treatment for more than two years despite that knowledge. *Hathaway*, 37 F.3d at 68-69. Here, however, Mr. Sundermier does

---

[6] As discussed in note 4, "RSDS" here refers to CRPS.

not point to any evidence indicating that the delay in treatment supports an inference of deliberate indifference.

Mr. Sundermier argues that Dr. Naqvi was also deliberately indifferent because there was "no clear plan of treatment," ECF No. 91 at 22, and he was prevented from "obtain[ing] simple orthopaedic or physical therapy treatment that would have been beneficial to his ability to recover," *id*. at 24. He further argues that the "plan of treatment formulated and provided by Dr. Orion . . . demonstrates that the Defendants' acted with the subjective element necessary to sustain [his] Eighth Amendment claim." *Id*. at 28. The record does not support these arguments.

In arguing that Dr. Naqvi did not create "a clear plan of treatment," Mr. Sundermier cites the following note PA McCrystal submitted to the URC on December 15, 2016:

> 53yo | ankle injury 8/31/15. Continues with cold, dusky, painful foot ? CRPS. Unable to bear weight. Has had multiple visits to ortho and vascular surgery. Has had xrays, CTA's, EMG, consultation with foot/ankle specialists, neurology, Narcotic pain medication. There has been mention of sympathetic nerve block as well as amputation. *It seems there is no clear plan of care.* I/M is amenable to amputation. If possible, request interdisciplinary case review. Consultation with vascular surgery and pre-op evaluation for amputation if amenable.

Ex. 2 at 32 (emphasis added). This note was written shortly after Dr. Moczka first noted that the condition was "possibly CRPS," Ex. 2 at 31, and explains the extensive care Mr. Sundermier had already received, including examination and testing by multiple specialists, *id.* at 32. It also discusses possible treatment options, *id.* at 32 ("sympathetic nerve block as well as amputation") and suggests further medical review to ascertain the correct treatment for Mr. Sundermier, *id.* ("interdisciplinary case review," "[c]onsultation with vascular surgery," and "pre-op evaluation for amputation"). Indeed, Mr. Sundermier received the treatment mentioned in this note, including consultation with vascular surgery (at Yale), sympathetic nerve block therapy, and an amputation, as well as other treatment, including angiograms and physical therapy. Ex. V. When

16

considered in context, this note demonstrates the extent of PA McCrystal's and Dr. Naqvi's efforts to diagnose and treat Mr. Sundermier, and the reference to "no clear plan of care" seems to be an acknowledgement that Mr. Sundermier presented a difficult medical case without a clear diagnosis. No reasonable juror, considering all the evidence in the record, could find based on PA McCrystal's bare reference to "no clear plan of care" that Dr. Naqvi was deliberately indifferent.

As for Dr. Orion, the evidence suggests that she was able to act quickly in creating and executing a plan of care for Mr. Sundermier in part because *he already had a tentative diagnosis when she began treating him*. Ex. 2 at 33, 36 (Dr. Orion noting that Mr. Sundermier "has received a diagnosis of RSDS" and "likely has RSDS").[7] Thus, contrasting the treatment Mr. Sundermier received at Yale *after* the diagnosis with the treatment he received from Dr. Naqvi *before* the diagnosis does not create a material dispute of fact about Dr. Naqvi's mental state. Similarly, the urgency of the need for early physical therapy was not clear until there was a diagnosis—a diagnosis that often takes months to establish. Ex. 2 at 38 (Dr. Oliver explained that "CRPS type 1 has the best prognosis if there is intervention within the first 3 months after developing these changes and the most effective treatment modality to date is PT and OT"); *see*

---

[7] Mr. Sundermier points to a note in Dr. Oliver's report stating that he "has not been able to obtain the proper medical care because he is incarcerated and is now admitted for potential left BKA." Ex. U at 2. In her deposition, however, Dr. Oliver explained that the statement was "the patient's opinion when I asked what happened to his extremity." Ex. 6 at 24-25. Even if this statement represented Dr. Oliver's medical opinion, "a difference of opinion . . . among medical professionals themselves, as to the appropriate course of medical treatment does not in and of itself amount to deliberate indifference." *Parks*, 144 F. Supp. 3d at 322 (internal quotation marks and citations omitted). Moreover, to the extent this was an opinion by Dr. Oliver about the adequacy of medical care in prison, Mr. Sundermier has not submitted any facts to suggest that Dr. Oliver had "sufficient facts or data" about access to care at MacDougall Walker to provide an expert opinion on the matter. Fed. R. Evid. 702 (noting that a witness may testify in the form of an opinion if, among other things, the testimony is based on sufficient facts or data).

*also* Exhibit 6 at 32 (Dr. Oliver explaining that the time to make a diagnosis "depends on the patient" and "a lot of times it takes six months before people can realize they have anything like this or can rule it out"). Dr. Alaec's March 2016 recommendation for "self-performed" physical therapy was made before the CRPS diagnosis and stated that physical therapy was for "ankle [range of motion] & strengthening." Ex. 2 at 26.[8] By itself, and unconnected to CRPS or any other diagnosis, this entry did not suggest that there was an obvious risk that in the absence of a referral for outside physical therapy, Mr. Sundermier would suffer substantial harm. In short, Mr. Sundermier does not point to any evidence indicating that Dr. Naqvi denied physical therapy or other treatment with a sufficiently culpable mental state. Rather, the undisputed evidence in the record shows that Dr. Naqvi made repeated efforts to treat Mr. Sundermier, seeing him frequently and referring him to multiple specialists, and that, to the extent Dr. Naqvi did not ensure prompt access to outside physical therapy treatment, it was due to the difficulty of diagnosing CRPS. Again, even if Dr. Naqvi's conduct fell below the standard of care and amounted to medical malpractice, that would not be a basis to deny summary judgment on the deliberate indifference claim.

### B. Dr. Wu

Dr. Wu was responsible for overseeing the medical staff at MacDougall Walker Correctional Institution. ECF No. 80-2 ¶¶ 60, 63; ECF No. 91-1 ¶¶ 60, 63. "The liability of a supervisor under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed

---

[8] Mr. Sundermier points to a statement in Dr. Oliver's report that "his ability to have proper [physical therapy] is next to impossible while he is incarcerated." Ex. 2 at 38. As already noted, however, Mr. Sundermier has not pointed to any evidence suggesting that Dr. Oliver had "sufficient facts or data" about access to care—including physical therapy—at MacDougall Walker to provide an expert opinion on the matter. Fed. R. Evid. 702.

through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Hernandez*, 341 F.3d at 145 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Mr. Sundermier has provided no evidence to support Dr. Wu's liability under any of these theories.

Mr. Sundermier argues that Dr. Wu "had actual knowledge of [his] situation and [knew] that his condition required urgent care," ECF No. 91 at 18, but "fail[ed] to act," *id*. at 24. Dr. Naqvi explained that Dr. Wu became "involved as diagnostic possibilities bec[a]me more complex and more uncommon." Ex. 4 at 83-84. He further stated that he told Dr. Wu his concern that Mr. Sundermier's "hormone treatment also interfered somehow with his circulation and [was] causing problems." Ex. 4 at 73-74. Based on these concerns, Dr. Naqvi and Dr. Wu agreed to stop Mr. Sundermier's hormone treatment through the URC process. ECF No. 80-2 ¶¶ 49-51; ECF No. 91-1 ¶¶ 49-51. This evidence indicates only that Dr. Wu was aware of the difficulty of diagnosing Mr. Sundermier's condition and discussed at least one possible cause of the condition with Dr. Naqvi.[9] Mr. Sundermier has not submitted any evidence to support a finding that Dr. Wu examined Mr. Sundermier, that he was directly responsible for scheduling treatments or procedures or making referrals, that he believed the actions of his subordinates were unconstitutional, that he created a policy sanctioning constitutional violations, or that he was grossly negligent in supervising Dr. Naqvi or any other subordinate.

---

[9] The Court notes that Mr. Sundermier is not bringing any claims relating to hormone medication. ECF No. 91-1 at ¶¶ 47-51.

## IV. Conclusion

For the reasons set forth above, the motion for summary judgment, ECF No. 80, is GRANTED. Attorney Buturla's appointment is terminated. He may, only if he wishes to do so, represent Mr. Sundermier in any appeal. If he does not wish to represent Mr. Sundermier in any appeal, he shall advise Mr. Sundermier of all steps necessary to perfect any appeal and if Mr. Sundermier requests that he do so, he shall file the notice of appeal in accordance with Local Rule 83.10(f)(3). The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/  MICHAEL P. SHEA
Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
           March 19, 2018